**UNITED STATES of America**

**v.**

**Kevin HOWARD**

**No. CRIM. H–03–93.**

United States District Court,
S.D. Texas,
Houston Division.

Jan. 31, 2007.

Jim E. Lavine, Zimmermann & Lavine, Houston, TX, for Kevin Howard.

## ORDER

GILMORE, District Judge.

Pending before the Court is Defendant Kevin Howard's motion to vacate his convictions based on a change in law after the verdict. (Instrument No. 1247).

## I.

On May 31, 2006, a jury returned a guilty verdict against Kevin Howard ("Howard"), the former Chief Financial Officer of the defunct Enron Broadband Services ("EBS") unit, on all five counts charged in the government's Sixth Superseding Indictment. (Instrument No. 1187; Instrument No. 914—*Sixth Superseding Indictment*). Specifically, the jury returned a general verdict finding that Howard had engaged in a conspiracy to commit wire fraud and to falsify Enron's books and records (*"Count One"*), in violation of 18 U.S.C. § 371, had committed three counts of wire fraud (*"Counts Two through Four"*), in violation of in violation of 18 U.S.C. §§ 1343 and/or 1346, and one count of falsifying Enron's books and records (*"Count Five"*), in violation of 15 U.S.C. § 78m(b)(2)(A) & (B), 78m(b)(5), 78ff and 17 C.F.R. § 240.13b2–1. (Instrument No. 1187).

On August 1, 2006, approximately two months after the jury found Howard guilty on all charges, the United States Court of Appeals for the Fifth Circuit issued an opinion in another Enron-related case, *United States v. Brown*, 459 F.3d 509 (5th Cir.2006), *petition for rehearing and for rehearing en banc denied*, No. 05–20319 (5th Cir. October 18, 2006). In *Brown*, a case involving similar facts, the Fifth Circuit vacated the conspiracy and wire fraud convictions of several defendants on the legal grounds that one of the two theories underlying the defendants' wire fraud convictions, the deprivation of honest services theory under § 1346, was flawed. Further, because the jury that convicted the defendants in *Brown* had not been asked to specify which wire fraud theory formed the basis of their verdict, the Court concluded that the defendants' convictions had to be vacated in accordance with the Supreme Court's mandate in *Yates v. United States*, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957) (stating that where a jury is not asked to indicate the basis for its verdict and one basis is nullified, the conviction(s) must be set aside), *overruled on other grounds by Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

On September 29, 2006, Howard filed a motion with this Court to vacate his convictions based upon a change in the law. (Instrument No. 1247). Howard's motion contends that the *Brown* opinion similarly unravels the legal theory underlying his convictions, thereby requiring that his convictions be vacated as well. Specifically, Howard argues that *Count One* of the Sixth Superseding Indictment charged Howard with engaging in a conspiracy to commit wire fraud and falsify Enron's books and records. (*Id.*, at 8). *Count One* contained three theories or bases under which Howard could be found guilty of the conspiracy charge, "two involving conspiracy to commit the offense of wire fraud and one involving conspiracy to falsify Enron's books and records." (*Id.*). The jury was instructed by the Court that in order to find Howard guilty of conspiracy, the United States did not have to prove that Howard had engaged in a conspiracy to commit both wire fraud and the falsification of Enron's books and records. (Instrument No. 1176, at 12–13—*Court's Instructions to the Jury*). Rather, the jury could find Howard guilty of the alleged conspiracy if they found him guilty of committing either offense; that is, wire fraud or the falsification of Enron's books and records. (*Id.*).

Further, *Court One* charged that the conspiracy to commit wire fraud be proven in two ways. (Instrument No. 1176, at 10). Howard could be found guilty if he had either (1) engaged in a scheme to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, in violation of 18 U.S.C. § 1343 (the "money or property" theory), or (2) had engaged in a scheme to deprive Enron and its shareholders of the intangible right to honest services of the company's employees by means of materially false and fraudulent pretenses, representations, and promises, in violation of 18 U.S.C. § 1346 (the "hon-

est services" theory). (*Id.;* Instrument No. 914, at 9–10). The jury was instructed that either of these two theories of wire fraud could provide a basis to find Howard guilty of the conspiracy to commit wire fraud and to falsify Enron's books and records, as alleged in *Count One*, as well as the corollary substantive counts of wire fraud alleged in *Counts Two through Four*. (Instrument No. 1176, at 11–18).

*Count One* of the Sixth Superseding Indictment alleged that Howard could also be found guilty of conspiracy if he had knowingly and willfully falsified Enron's books, records and accounts, in violation of 15 U.S.C. § 78m(b)(2)(A) & (B), 78m(b)(5), 78ff and 17 C.F.R. § 240.13b2–1. (Instrument No. 914, at 9). *Count Five* charged Howard with a substantive count of falsifying Enron's books and records. (*Id.*, at 11–12). Because *Count One* charged Howard with conspiracy to commit wire fraud and to falsify Enron's books and records, and because wire fraud could be proven in two ways, the falsification of Enron's books and records provided a third theory or basis by which to find Howard guilty of the alleged conspiracy. The jury was instructed that any one of these three theories could support a guilty verdict that Howard had engaged in the conspiracy to commit wire fraud and to falsify Enron's books and records, as alleged in *Count One*. (Instrument No. 1176, at 12–13).

At the government's request, the Court also included a *Pinkerton* instruction in the jury charge. (Instrument No. 1022, at 51). Neither the government nor Howard objected to the *Pinkerton* instruction given by the Court. (Instrument No. 1266, at 8). A *Pinkerton* instruction dictates that a jury may find a conspirator liable for the reasonably foreseeable acts of his co-conspirators done in furtherance of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489

(1946). The *Pinkerton* instruction provided to the jury, drawn directly from Fifth Circuit Pattern Jury Instruction 2.22, stated as follows:

> A conspirator is responsible for offenses committed by other conspirators if the conspirator was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of, or as a foreseeable consequence of, the conspiracy. Therefore, if you have first found a defendant guilty of the conspiracy charged in Count One and if you find beyond a reasonable doubt that during the time the defendant was a member of that conspiracy, other conspirators committed the offenses in Counts Two through Five in further of or as a foreseeable consequence of that conspiracy, then you may find the defendant guilty of Counts Two through Five even though the defendant may not have participated in any of the acts which constitute the offenses described in those counts.

(Instrument No. 1176, at 13–14). The *Pinkerton* instruction directed that the jury could find Howard guilty of *Counts Two through Four*, wire fraud, and *Count Five*, falsification of Enron's books and records, if the jury found Howard guilty of the conspiracy alleged in *Count One*—and *Count One* set forth three theories or bases for the jury to find Howard guilty of the alleged conspiracy.

Howard argues that the structure of the jury charge, and particularly the *Pinkerton* instruction, enabled the jury to find Howard guilty on all counts, if the jury determined that one of the three theories alleged in *Count One* had been proven by the United States, those being either one of the two wire fraud theories or the falsification of books and records theory. Howard contends that because *Brown* declared one of the three theories, the honest services theory, flawed, *Brown* essentially eviscerates his convictions. *Brown*, 459 F.3d at 513. Howard argues that the jury's general verdict demonstrates that there is no way to know which theory of wire fraud the jury relied upon in reaching its verdict on *Count One*. Nor did the general verdict indicate whether the jury's finding of Howard's guilt on *Count One* was based upon the falsification of books and records theory. Therefore, Howard argues, the jury could have based its verdict on the honest services theory declared flawed in *Brown*, rather than the two other theories of guilt that the jury was instructed to consider in finding Howard guilty on *Count One*. (Instrument No. 1247, at 4–9).

Accordingly, Howard argues, his conviction on all counts must be vacated since there is no way to discern whether the jury found Howard guilty on *Counts Two through Four* and *Count Five*, because the *Pinkerton* instruction invited them to do so if they found him guilty on *Count One*—and there is no way for the Court to determine which of the three theories the jury relied upon in reaching its guilty verdict on *Count One*. Howard therefore urges the Court to vacate his conviction on all counts.

On November 9, 2006, the United States filed its response to Howard's motion to vacate. (Instrument No. 1266). The United States "concedes that the jury's verdict finding defendant Howard guilty on Counts One through Four must be vacated." (Instrument No. 1266, at 7). However, the United States does not concede that Howard's guilty verdict on *Count Five* is necessitated by *Brown* or otherwise. (Instrument No. 1266, at 7–12). Rather, the government asserts that substantial evidence was presented to the jury to support the jury verdict that Howard had individually committed the falsification of

Enron's books and records as alleged in *Count Five*. Specifically, the government contends that the evidence showed beyond a reasonable doubt that through his participation in Project Braveheart ("Braveheart"), Howard had directly "caused the falsification of Enron's earnings and therefore of its books and records." (*Id.*, at 8).

The government argues that despite the *Pinkerton* instruction, the Court instructed the jury that "[e]ach count, and the evidence pertaining to it, should be considered separately. The case of each defendant should be considered separately and individually." (Instrument No. 1176, at 8). The jury instructions, according to the government, "pointed the jury toward considering the defendant's direct responsibility for the books and records violation." (Instrument No. 1266, at 10). Thus, the government argues that the jury instructions did not premise Howard's guilt on *Count Five* solely on *Pinkerton* co-conspirator liability, but rather, the instructions guided the jury to consider his guilt independent of the *Pinkerton* instruction. (*Id.*).

Moreover, the government contends that the evidence and the prosecutor's summation arguments support this position. The government highlights the prosecutor's initial summation at trial as evidence that the government did not rely on a *Pinkerton* theory in arguing to the jury that Howard should be found guilty of the falsification of Enron's books and records. (Instrument No. 1266, at 9; Trial Record, at 3010–11). Specifically, the prosecutor stated that *Count Five*, the falsification of Enron's books and records, was detached from the conspiracy charge and did not deal "with a plan of some sort." (Trial Record, at 3010–11). Furthermore, in rebuttal summation, the prosecutor stated that Howard directly committed the offense alleged in *Count Five* by "causing

the falsification," either directly or indirectly, of Enron's books and records. (Trial Record, at 3176–77). The government also asserts that it did not proffer evidence that "another person actually falsified Enron's books and records." (Instrument No. 1266, at 8). Consequently, the government contends that the jury instructions and the prosecutor's arguments emphasized to the jury that it should consider the evidence presented against Howard individually, and not on the basis of *Pinkerton* liability. Therefore, according to the government, it is substantially likely that above all, the jury convicted Howard on *Count Five* in response to the evidence offered against him individually at trial. (Instrument No. 1266, at 8).

In support of its argument that this Court may uphold Howard's conviction on *Count Five*, even when considering the potential implications of the *Pinkerton* instruction, the government points to case law from the United States Court of Appeals for the Ninth Circuit. The government argues that the case of *United States v. Manarite* stands for the proposition that even where a jury has been given a *Pinkerton* instruction and finds a defendant guilty of conspiracy and the conspiracy conviction is later reversed or vacated, a court is not compelled to also vacate the defendant's conviction(s) on the substantive count(s) alleged to be the objects of the conspiracy. 44 F.3d 1407 (9th Cir. 1995). If a court instead determines that, with or without a *Pinkerton* instruction, a defendant would have been convicted of a substantive count alleged to be an object of the conspiracy, then under *Manarite*, a defendant's conviction on the substantive count need not be vacated, because there exists an independent evidentiary basis for the conviction. The government argues that the evidence presented at trial was

sufficient to uphold Howard's conviction on *Count Five.*

On November 15, 2006, Howard filed a reply to the government's response to his motion to vacate. (Instrument No. 1270). In response, Howard argues that his conviction on *Count Five* can not be divorced from the implications of the *Pinkerton* instruction, which invited or enabled the jury to find Howard guilty on *Count Five* if the jury, relying on any one of three theories set forth in *Count One,* found Howard guilty of conspiracy. (*Id.,* at 3–6). Howard contends that the "[g]overnment can not prove that the jury did not find Kevin Howard guilty of conspiracy to commit honest services wire fraud in Count One, and the [g]overnment cannot prove beyond a reasonable doubt that the jury did not then find him guilty on Count Five under Pinkerton." (*Id.,* at 4–5). Howard further argues that the evidence presented against him is insufficient to uphold his conviction on *Count Five,* especially given the impact that the *Pinkerton* instruction may have had on the jury verdict. Howard emphasizes that there is simply no way for the Court to dissect the jury verdict and ascertain whether Howard was convicted on *Count Five* based upon only on the evidence presented against him individually at trial, and not on the basis of *Pinkerton* co-conspirator liability. Howard argues that through the *Pinkerton* instruction, *Count One* and *Count Five* are inextricably intertwined and therefore, if this Court vacates Howard's conspiracy and wire fraud convictions on the basis of *Brown* or otherwise, Howard's conviction on *Count Five,* the falsification of Enron's books and records, must be also be vacated. Howard reurges that this Court vacate his conviction on all counts.

## II.

■ Howard points to the bright line rule established in *Yates* in support of his motion to vacate his convictions based upon a change in the law. In *Yates,* the defendants had been charged with a conspiracy which asserted three separate objects, and the jury rendered a general guilty verdict. However, the Supreme Court found that one of the three alleged objects was insufficient as a matter of law to support a conviction. In rejecting the government's argument that the verdict should nonetheless be upheld on the basis of one of the remaining objects, the Court held that a general verdict must be set aside "where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." 354 U.S. at 312, 77 S.Ct. 1064; *see also Zant v. Stephens,* 462 U.S. 862, 881, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (confirming "that a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground.").

The Supreme Court subsequently limited the *Yates* holding to instances where one of the potential bases of conviction was legally insufficient rather than factually insufficient. *See Griffin v. United States,* 502 U.S. 46, 58–59, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) (clarifying that the rule established in *Yates* only applies when there is legal error in one of the bases for conviction). In *Griffin,* the Court explained that by "legal error," it meant "a mistake about the law," not a "mistake concerning the weight or the factual import of the evidence." *U.S. v. Salmonese,* 352 F.3d 608, 624 (2d Cir.2003) (*quoting Griffin,* 502 U.S. at 56–59, 112 S.Ct. 466); *see also U.S. v. Mann,* 161 F.3d 840, 856–57 (5th Cir.1998) (confirming that *Yates* and *Griffin* are applicable in cases involving multi-object conspiracies, where one of

the alleged objects of the conspiracy is legally defective).

Howard argues that the *Brown* opinion clearly demonstrates that one of the two theories of wire fraud asserted against him constituted a change or mistake in the law, as described in *Griffin,* since *Brown* plainly declared that the honest services theory of wire fraud asserted against Howard at trial to be flawed as applied. Further, as the honest services theory was one of three bases for his conspiracy conviction, and the Court's *Pinkerton* instruction allowed the jury to find Howard guilty on the substantive counts alleged in *Counts Two through Four* and *Count Five,* Howard contends that there is no way to assess whether the jury's general guilty verdict was based upon the no longer supportable honest services theory. Howard asserts that *Yates* therefore compels the conclusion that his convictions on all counts be vacated.

## III.

### A.

Howard contends that the factual background of *Brown* and his own case describe the "exact [same] scenario," and therefore, this Court should similarly vacate his conspiracy and wire fraud convictions. (Instrument No. 1247, at 2). In *Brown,* the Fifth Circuit reviewed the conspiracy and wire fraud convictions of four Merrill Lynch employees who had participated in the bogus sale of three power-generating Nigerian barges from Enron to Merrill Lynch ("Merrill"). 459 F.3d at 514–17. The purpose of the sale was to enable Enron to record earnings of approximately $12.5 million dollars from the sale and resultantly meet its earning targets for the fourth fiscal quarter of 1999. *Id.* Merrill participated in the transaction after receiving an oral guarantee from Enron executives, principally Andrew Fastow,

Enron's former Chief Financial Officer, that Merrill would not lose money on the transaction and that Enron would remove Merrill from the transaction within six months. *Id.* Merrill performed no diligence surrounding the transaction, and in December 1999, agreed to buy the barges. *Id.* As promised by Enron executives, six months after Merrill bought the barges, Enron arranged for LJM2, an entity controlled by Andrew Fastow, to effectively buy back the barges, thereby unwinding Merrill's purchase of the barges in the first place. *Id.* Merrill received a flat rate of compensation in return for its participation in the sham purchase. *Id.*

The Government charged the defendants with one count of conspiracy and two counts of wire fraud. 459 F.3d at 516. The conspiracy count alleged a conspiracy to commit wire fraud in violation of § 1343, the money or property theory, and § 1346, the honest services theory, and to falsify Enron's books and records in violation of Title 15, the books and records theory. *Id.* At trial, the jury convicted five of the six defendants on the conspiracy and wire fraud counts. *Id.* at 517. The sixth defendant was acquitted. *Id.*

■ Four of the five convicted defendants, all of whom were Merrill employees that participated in the barges transaction, appealed the jury verdict, arguing, *inter alia,* that honest services wire fraud does not extend to the type of conduct with which they were charged. The Fifth Circuit agreed, holding that honest services wire fraud did not apply to the barges transaction. Specifically, the Court held that:

> [W]here an employer intentionally aligns the interests of the employee with a specified corporate goal, where the employee perceives his pursuit of that goal as mutually benefitting him and his

employer, and where the employee's conduct is consistent with that perception of the mutual interest, such conduct is beyond the reach of the honest-services theory of fraud as it has hitherto been applied.

*Brown,* 459 F.3d at 522. That is, under *Brown,* an employee deprives his employer of "honest services" when the employee promotes his own interests, rather than the interests of his employer. Even where an employee commits a fiduciary breach in the course of primarily servicing the interests of his employer, he does not deprive his employer of honest services under 18 U.S.C. § 1346. *Id.,* at 521 (cautioning that "not every breach of fiduciary duty works a criminal fraud") (citations omitted). The *Brown* court reasoned that because the barges transaction was conducted to benefit Enron and not to surreptitiously enrich the defendants at Enron's expense, the defendants' conduct did not fall within the purview of the honest services theory of wire fraud—even though the defendants received monetary bonuses for their participation in the transaction. *Id.,* at 522–24.

In finding that the defendants' conduct did not constitute a deprivation of honest services violative of § 1346, the *Brown* court vacated the convictions of each of the defendants for conspiracy and wire fraud. *Brown,* 459 F.3d at 523. Citing *Yates,* the Court reasoned that because one of the three bases for the jury to find the defendants guilty of conspiracy to commit wire fraud and falsify books and records had been declared flawed, the defendants' convictions for conspiracy and wire fraud could not be "upheld." *Id.*

### B.

■ Howard contends that his participation in Braveheart parallels the participation of the *Brown* defendants in the Nigerian barges transaction. Howard argues that "whatever else one may say about the Braveheart transaction, it was designed, in whole or in part, to promote the interests of Enron Broadband Services and not purely the interests of Kevin Howard. Under *Brown,* such conduct does not run afoul of Section 1346." (Instrument No. 1247, at 2).

Akinto the Nigerian barges transaction, Braveheart involved a series of sham transactions that enabled EBS to book earnings of approximately $ 111 million for the fourth fiscal quarter of 2000 and the first fiscal quarter of 2001, thereby meetings its financial targets. (Instrument No. 914, at 6). To carry out Braveheart, EBS sold a portion of its interest in a video-on-demand partnership with Blockbuster to a joint venture controlled by EBS. (*Id.*). The joint venture, named EBS Content Systems, was composed of nCube, a small technology company based in Beaverton, Oregon, and Thunderbird, an investment vehicle owned by an Enron-controlled investment fund. (*Id.,* at 5–6). As Enron had done to Merrill in the Nigerian barges transaction, to induce nCube to participate in the EBS Content Systems joint venture, EBS executives had promised nCube that it would be removed from the transaction by early 2001 and would receive back both the money it had contributed to the transaction in addition to a fixed amount. (*Id.,* at 8). Further, the Sixth Superseding Indictment alleged that EBS selected nCube to be a joint venture partner because nCube, as a small EBS vendor, would allow EBS to control EBS Content Systems. (*Id.,* at 8).

In December 2000, EBS sold its interest in the video-on-demand partnership with Blockbuster to EBS Content Systems, which EBS controlled. (Instrument No. 914, at 8). Thereafter, EBS recorded $ 111 million dollars in revenue for EBS

and Enron over the fourth quarter of 2000 and the first quarter of 2001. (*Id.*, at 7). In early 2001, pursuant to their agreement, EBS removed nCube from the EBS Content Systems joint venture. (*Id.*, at 8).

Howard contends that the facts at issue here and the facts of *Brown* are virtually identical. As with the Nigerian barges transaction. Braveheart was designed to enable EBS and Enron to meet its earnings targets. Furthermore, Howard's bonus was tied to the successful completion of Braveheart, and thus, Howard argues that as with the *Brown* defendants, EBS had aligned his interests as an employee with a "specified corporate goal." *Brown*, 459 F.3d at 522. Therefore, Howard argues, *Brown* compels the conclusion that his conduct and participation in Braveheart is "beyond the reach of the honest-services theory of fraud," which in light of the jury general verdict and *Yates*, requires the vacatur of his convictions for conspiracy, *Count One*, and wire fraud, *Counts Two through Four.* Furthermore, Howard argues since the *Pinkerton* instruction authorized the jury to find Howard guilty on *Count Five*, if the jury found him guilty on *Count One*, and because there is no way to know whether the jury based its *Count One* guilty verdict on the "honest services" theory of wire fraud declared flawed in *Brown*, his conviction on *Count Five* should also be vacated.

The government agrees that *Brown* compels the vacatur of Howard's convictions for conspiracy, *Count One*, and wire fraud, *Counts Two through Four.* (Instrument No. 1266, at 6). "The government concedes that as interpreted in *Brown*, the honest services provisions, 18 U.S.C. § 1346, does not encompass the conduct charged in Count One through Four of the Sixth Superseding Indictment." (*Id.*).

In both *Brown* and Howard's case, the alleged conspiracy charged three theories or bases under which the defendants could be found guilty of the conspiracy, two involving conspiracy to commit the offense of wire fraud and one involving conspiracy to falsify Enron's books and records. Finding one of the theories of wire fraud to be flawed, the *Brown* court vacated the defendants' conspiracy and wire fraud convictions since "the jury was not asked to indicate the basis for its verdict," and it was unknown whether the jury may have based its verdict on the honest services theory. *Brown*, 459 F.3d at 518.

The Court concludes that the facts distinguishing *Brown* from Howard's case are nuanced, and that *Brown* indeed compels the vacatur of Howard's convictions for conspiracy, *Count One*, and wire fraud, *Counts Two through Four.* Since Howard's conviction in May 2006, the *Brown* opinion has affected an intervening change in the law on what constitutes honest services wire fraud under 18 U.S.C. § 1346. Accordingly, because the jury in this case issued a general verdict and because it is impossible for this Court to determine the basis of the jury's verdict on *Count One* and *Counts Two through Four, Yates* and *Griffin* require that Howard's convictions on those counts be **VACATED**.

### C.

■ Lastly, the government and Howard disagree on whether the Court's inclusion of a *Pinkerton* instruction in the jury charge also requires that Howard's conviction on *Count Five*, the falsification of Enron's books and records, be vacated. Howard contends that the inclusion of a *Pinkerton* instruction authorized the jury to find Howard guilty of *Counts Two through Five*, if the jury found Howard or any of his alleged co-conspirators guilty of the conspiracy alleged in *Count One.* Howard argues that because *Brown* declared the honest services theory of wire fraud to

be flawed as applied to the factual scenario existent here, that one of the three bases of his conviction for conspiracy in *Count One* was thereby vitiated, and consequently, it is undeterminable whether the jury convicted him on *Count Five* on the basis of their guilty verdict on *Count One*. (Instrument No. 1270, at 11). Howard argues that through the *Pinkerton* instruction, *Count One* and *Count Five* are tethered together, and thus, as *Count One* fails, so too must *Count Five*.

The government principally and correctly counters that *Brown* had no effect on the law underlying Howard's conviction on *Count Five*. (Instrument No. 1266, at 7). The government argues that the *Brown* decision "interprets only the honest services provision, and nothing in that decision holds or suggests that a corporate employee's intentional falsification of the books and records of the corporation does not fall within the 'books and records' provision of Title 15." (*Id.*). However, even conceding that *Brown* compelled the vacatur of Howard's conspiracy and wire fraud convictions, the government nevertheless maintains that vacating Howard's conviction on *Count One* does not upset Howard's conviction on *Count Five*.

The government contends that the "evidence showed beyond a reasonable doubt that Howard directly participated in Braveheart and therefore that he directly caused the falsification of Enron's earnings and therefore of its books and records." (Instrument No. 1266, at 8). The government argues that it did not proffer evidence that anyone other than Howard had falsified Enron's books and records, nor did the government intimate to the jury that it should convict Howard on the basis of *Pinkerton* co-conspirator liability. (*Id.*). Consequently, the government surmises that the evidence could not have led the jury to convict Howard of *Count Five*

on the basis of *Pinkerton* co-conspirator liability and that the jury mostly likely convicted Howard on *Count Five* without reference to the Court's *Pinkerton* instruction. Therefore, contends the government, *Count Five* rests on the "effect his fraudulent conduct had on Enron's books and records." (*Id.*, at 7).

Furthermore, the government stresses that the Court's jury charge, apart from the *Pinkerton* instruction, directed the jury to consider Howard's individualized responsibility for the books and records violation. (Instrument No. 1266, at 10). The government contends that the instructions on *Count Five* directed the jury to determine whether Howard had falsified or caused to be falsified Enron's books and records. (*Id.*; Instrument No. 1176, at 19–20). Resultantly, the government argues that the instructions focused the jury on whether Howard had individually violated the books and records provisions by making a false entry or causing another to do so and to consider his guilt independent of the *Pinkerton* instruction. (*Id.*).

■ The *Pinkerton* rule is necessarily premised on the existence of conspiracy and dictates that in a conspiracy, the co-conspirators act for each other in carrying the conspiracy forward and an act of one may be treated as act of all. *Pinkerton*, 328 U.S. at 646–47, 66 S.Ct. 1180. That is, under *Pinkerton*, "a conspirator can be found guilty of a substantive offense committed by a co-conspirator and in furtherance of the conspiracy, so long as the conspirator's acts are within the reasonably foreseeable scope of the conspiracy." *United States v. Pierce*, 893 F.2d 669, 675 (5th Cir.1990) (explaining *Pinkerton* ).

When a jury is provided with a *Pinkerton* instruction and counseled by the Court on its application to a defendant, it is assumed that the jurors pay heed to the Court's directives. Courts presume that

jurors "conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." *Francis v. Franklin,* 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). Thus, where a *Pinkerton* instruction is provided, it can not be assumed that a jury would disregard or overlook the *Pinkerton* instruction in the course of its deliberations. Indeed, all that may be presupposed about the jury's treatment of the *Pinkerton* instruction is that the jury considered it, along side the Court's other instructions, while arriving at its verdict.

However, Howard's conviction presents a scenario where the jury may or may not have convicted him based upon *Pinkerton* liability. The Court can not divine whether the jury's finding of a guilty verdict on *Count Five* was in fact based upon *Pinkerton.* Consequently, for Howard's conviction on *Count Five* to be upheld, the Court looks to the evidence to determine whether, even in the absence of a *Pinkerton* instruction, the jury would have convicted Howard on *Count Five. See Manarite,* 44 F.3d at 1419 (determining that the reversal of the defendants' conspiracy convictions did not undermine the validity of the defendants' convictions on the substantive counts, because the court found beyond a reasonable doubt that the jury would have convicted the defendants of the substantive counts based upon principal or aider and abettor liability); *see also United States v. Olano,* 62 F.3d 1180, 1199 (9th Cir.1995) (stating that convictions on substantive counts may stand where the court is convinced beyond a reasonable doubt that the jury would have convicted the defendant of each substantive count based upon the defendant's own conduct); *United States v. Choy,* 309 F.3d 602 (9th Cir.2002). "Evidence is sufficient to support a conviction if, viewing the evidence presented at trial

in the light most favorable to the government, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Castaneda,* 16 F.3d 1504, 1510 (9th Cir.1994) (emphasis in original) (citation omitted).

The Court's instructions to the jury dictated that, for the jury to find Howard guilty on *Count Five,* the government needed to prove beyond a reasonable doubt as to Howard:

*First:* That at the time of the alleged offense, Enron Corporation was an issuer of securities that were listed in a national stock exchange, or was an issuer of securities that was required to file quarterly and annual reports with the Securities and Exchange Commission;

*Second:* That the defendant falsified or caused to be falsified any book, records or account of Enron Corporation with respect to a material fact;

*Third:* That such falsification caused the books, record or account to not, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of Enron Corporation; and

*Fourth:* That the defendant acted knowingly and willfully.

(Trial Record, at 3206; Instrument No. 1266, at 4). The Court also defined the meaning of the terms falsify, material, knowingly and willfully for the jury. (*Id.,* at 3206–07).

The government summarily states that its trial evidence "showed beyond a reasonable doubt that Howard directly participated in Braveheart" and that he directly caused the falsification of Enron's earnings, thereby leading to the falsification of its books and records. (Instrument No. 1266, at 8). In making this claim, the

government neither highlights nor points to any specific witness testimony or evidence in support of their argument, and it is the government's duty to direct the Court's attention towards evidence buttressing their case. *See Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) (stating that a district court is not required to scour the record looking for facts supporting a party's case); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.1998) (same). Nonetheless, having presided over this trial on two separate occasions, first in 2005 and subsequently in 2006, this Court has reviewed the record and is unable to definitively draw the conclusion which the government asks the Court to draw—that is, that there was evidence from which the jury could find Howard guilty beyond a reasonable doubt of falsifying Enron's books and records without reliance on one of the prohibited conspiracy elements. (Instrument Nos. 864 and 1187).

It is the government's obligation here to demonstrate beyond a reasonable doubt that the jury convicted Howard on *Count Five* solely upon his own conduct, and not upon the conduct of another. In the face of uncertainty that the jury found Howard guilty of *Count Five* based upon his own conduct, the *Pinkerton* instruction portends at least a possibility that Howard was convicted based upon the conduct of another.

The jury instructions enabled Howard to be convicted on *Count Five* based upon his own acts *or* the acts of an alleged co-conspirator, even if done in Howard's absence and without his knowledge. Because it is unknown whether the jury would have convicted Howard absent the *Pinkerton* instruction, the Court can not eliminate the possibility that the jury convicted Howard on the basis of *Pinkerton* co-conspirator liability, nor can the Court

conclude that the jury would have convicted Howard on *Count Five*, independent of *Pinkerton*.

As it can not be conclusively determined by the government nor this Court that the jury did not base its decision upon the *Pinkerton* instruction in finding Howard guilty on *Count Five*, there is a reasonable possibility that Howard's conviction on *Count Five* was indeed tethered to *Count One*. An important tenet of our criminal justice system is that a defendant is innocent until proven guilty beyond a reasonable doubt. *United States v. Wesevich*, 666 F.2d 984, 985–86 (5th Cir.1982). When it is uncertain whether a defendant was convicted under an appropriate standard, the integrity of the judicial system is undermined. Because the general verdict provides no insight into the basis of the jury's determination that Howard had falsified Enron's books and records in violation Title 15, and because there is a reasonable possibility that the jury found Howard guilty on the basis of *Pinkerton* co-conspirator liability, the Court finds that Howard's conviction on *Count Five* must also be **VACATED**.

The entrance of this order does not foreclose the government's right to retry Howard on all legally permissible charges in a reasonable time frame. *See Tibbs v. Florida*, 457 U.S. 31, 40–45, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982); *United States v. Briggs*, 920 F.2d 287, 293–94 (5th Cir. 1991). Accordingly, the Court orders the parties to appear for a scheduling conference on February 20, 2007 at 9:30 a.m.

## IV.

For the foregoing reasons, Defendant's motion to vacate his convictions based on a change in law after the verdict is **GRANTED**. (Instrument No. 1247).

The Clerk shall enter this Order and provide a copy to all parties.